IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AZANIAH BLANKUMSEE | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. PWG-20-1188 |
| GOVERNOR LARRY HOGAN | * | |
| Defendant | * | |

\*\*\*
**MEMORANDUM OPINION AND ORDER**

Plaintiff Azaniah Blankumsee is incarcerated at the Maryland Correctional Training Center (MCTC), in Hagerstown, Maryland, where he contends that safety precautions to address the COVID-19 pandemic are insufficient and, as a result, his health is endangered. Specifically, Blankumsee asserts that MCTC personnel enter and leave the facility without being tested for the virus, and inmates are not provided gloves, masks, virus testing, or adequate cleaning supplies. Blankumsee asserts Governor Hogan has failed to respond appropriately to the risk the virus poses, and that on April 20, 2020, the Governor indicated that he will not release violent offenders. Blankumsee asserts that because he has asthma he is particularly vulnerable if exposed to the virus, which causes him "anguish and fear" for his life. Complaint, ECF No. 1 at 4. Blankumsee seeks his immediate release from incarceration, $150,000 damages, and declaratory relief.

Before initiating formal proceedings, I directed counsel for the Division of Correction to provide an initial response outlining the measures being taken at MCTC to address the COVID-19 public health crisis. Declarations signed by Richard Dovey, Warden of MCTC, and Sharon Baucom, M..D., Director of Clinical Services for the Maryland Department of Public Safety and

Correctional Services ("DPDCS"), indicate that extensive regulatory guidelines have been implemented for the purpose of preventing an outbreak of the COVID-19 virus within correctional facilities, including MCTC.

### MCTC Response to COVID-19

As of May 26, 2020, of the approximately 2721 inmates at MCTC, not one has tested positive for the COVID-19 virus. Dovey Decl. ECF No. 7-1 ¶5. In accordance with Governor Hogan's Executive Order Number 20-04-18-01, DPSCS has worked to determine individuals who meet the criteria for early release. *Id.* ¶3. MCTC is in the process of implementing it and eligible inmates are being assessed for early release as required by the Executive Order. *Id; see also* Executive Order, ECF No. 7-1 at 10-14; DPSCS policies and guidelines, ECF No. 7-1 at 19-90. Blankumsee does not meet the criteria for early release under the Executive Order. Dovey Decl. ECF No. 7-1 ¶3; Offender Case Management System Records, ECF No. 7-1 at 16-17.

Counsel for the Division of Correction asserts that staff at MCTC has reasonably responded to the COVID-19 pandemic, and there is no basis for Blankumsee's request for relief, noting that in *Antietam Battlefield KOA, et al, v Lawrence J. Hogan, et al.*, Civil No. CCB-20-1130, __ F.Supp. 3d__ , 2020 WL 2556496 *1 (D. Md. May 20, 2020), the Honorable Catherine C. Blake determined that Governor Hogan has employed "the emergency powers granted to him by the state legislature, has issued a series of executive orders designed to slow the spread of the disease and to protect the health of Maryland residents" informed by the advice of acknowledged public health professionals." Among these public officials is Dr. Clifford S. Mitchell who has been "actively involved in the planning and implementation of Maryland's response" to the novel virus, including working with the Department of Public Safety and Correctional Services, on "testing strategies, safe practices, containment and mitigation strategies in congregate housing

settings, and safe re-opening strategies and plans." ECF No. 7 at 12; *Antietam Battlefield, KOA*, Attachment, Mitchell Decl. ECF No. 7-4 ¶ 4.

To comply with the Governor's executive order and DPSCS directives and to address the risks posed by COVID-19, staff at MCTC have implemented numerous and comprehensive health and safety precautions.

On March 12, 2020, all regular inmate visitation at MCTC was suspended. Dovey Decl. ECF No. 7-1 ¶ 12.

As of March 20, 2020, inmates were required to keep six feet between them in the dining hall and were provided styrofoam trays to take back to their cells. The dining hall was closed for seating. *Id*. ¶ 11. Gym was cancelled, and no contact sports were allowed. *Id*. ¶ 13.

Since April 2, 2020, inmates in the recreation hall are limited to ten at one time and officers have direct monitoring ability. *Id*. The dispensary and commissary are limited to 10 inmates at a time and marked for social distancing. *Id.* The inmate law library is available upon request with a seven inmate limit per time slot. *Id.*

On April 12, 2020, modified movement was initiated at MCTC stopping all inmate traffic to the dining hall and mass movement. *Id*. ¶ 12. Inmates eat in their cells or housing units. *Id.*

All inmates are required to wear face coverings before they are allowed to exit their cells. *Id*. ¶ 13. Social distancing is strictly enforced. *Id*. During outside recreation, 50 inmates are allowed in the courtyard with 10 inmates per section; the sections are marked with painted lines and orange cones. *Id*. Inmates presently participate in religious worship in their individual cells. *Id*. ¶ 14.

In Blankumsee's housing unit, inmates are provided cleaning supplies upon request. *Id*. ¶¶ 10, 4. Inmates are regularly provided soap free of charge. *Id.* ¶ 15. The sinks inside the cells

have hot and cold running water. *Id.* Showers are available to three inmates at a time and under staff control. *Id.* Inmates have access to laundry services in their housing unit. *Id.*

Housing units are cleaned including the tiers on an ongoing basis, dayrooms after each use, and showers twice times daily and one intense cleaning weekly. *Id.* ¶ 10. Housing unit air handling systems have been inspected and the filters cleaned. *Id.* Inmate housing unit common areas are deep cleaned with a germicidal pump prayer. ¶ 22. Pump sprayers are used to clean all areas of the facility. *Id.* Blankumsee, who is assigned to a sanitation job, has been provided with sneeze guards[1] and gloves. *Id.* ¶ 4.

Inmates have access to medical and mental health care. *Id.*, ¶16. Medical fees for inmates are waived. *Id.* Any inmate with "flu like" illness is required to be evaluated by a medical practitioner as soon as possible. *Id.* ¶17. If the inmate has severe symptoms or suspected to have COVID-19, he is taken to a hospital. *Id.* ¶ 18. Inmates in close contact with an inmate or staff with COVID-19 are evaluated by medical staff and quarantined in a separate designated locked tier under medical supervision. *Id.* They are quarantined in a designated space to a different housing unit with a specialized wing. *Id*. Inmates are not released from quarantine until medical personnel authorize their release back to their housing unit. *Id.* Centers for Disease Control (CDC) and DPSCS guidelines are strictly followed. *Id.*

Staff entering MCTC are required to practice social distancing at all times and frequently wash their hands. Staff with flu like symptoms and or fever will be evaluated and sent home. *Id.* ¶ 21. Staff have received training on proper use of personal protective equipment and social distancing. *Id.* ¶ 24. Since early April 2020, MCTC staff are required to wear sneeze guards and face shields. Protective N95 masks have started to be distributed to staff. *Id*.

---

[1] A sneeze guard is a washable cloth that covers the face and nose. Dove Decl. ECF No. 7-1 ¶ 9.

As of May 26, 2020, four MCTC correctional staff members have tested positive for COVID-19. *Id*. ¶ 6. Two worked as supply officers in the clothing and package room areas. *Id*. Blankumsee encountered one of the supply officers on February 20, 2020, and has never been seen by the other. *Id*. The other two are custody correctional officers; one of whom was in a field training program and worked in Blankumsee's housing unit on May 4 and 6, 2020. *Id*. That officer would not have had close contact with Blankumsee. *Id*. These staff members are required to remain off site for medical treatment until they provide medical documentation that they have completed treatment and are cleared to return to work. *Id*. Additionally, contact tracing is done for the ten days preceding the correctional officer's positive test. *Id*. This did not include the May 4, 2020 and May 6, 2020 dates. *Id*. Areas where the affected staff worked have been sanitized. *Id*. All those individuals identified as having had close contact during the contact tracing period were notified, screened, and monitored including self-monitoring for COVID-19 symptoms, or quarantined or isolated in accordance with the Centers for Disease Control and Prevention (CDC) guidelines. *Id*. A vendor with expertise in cleaning, has deeply cleaned and sanitized the staff area where the correctional supply staff member tested positive. *Id.* at ¶ 22.

Testing correctional staff for COVID-19 is determined by the staff member's physician. *Id.* ¶ 19. Statewide staff testing recently began in the Jessup region and will continue throughout the State systematically. *Id.* Supplies of COVID-19 tests are limited both in the community and in the prisons. DPSCS continues to monitor the availability of tests. *Id.* ¶ 20.

Dr. Sharon Baucom states that "neither medical nor societal standard presently require universal testing for COVID-19." Baucom Decl. ECF No. 7-2 ¶ 3. Baucom explains that based on generally accepted medical practice, testing is prioritized according to the patient's illness and

circumstances. "DPSCS through its private health care contractors in concert with local hospitals provides testing consistent with" CDC guidelines. *Id*. To date DPSCS have received 1,000 COVID-19 test kits, and expects to receive more. *Id*. ¶ 5. The tests are being distributed to DPSCS facilities with the most suspected COVID-19 cases and in accordance with CDC guidelines. As more tests are received, they will be distributed based on medical need. *Id*. ¶¶ 4, 5.

### Exhaustion of Remedies

Review of MCTC's Administrative Remedy Procedure Index for administrative remedies procedure (ARP) complaints shows Blankumsee has filed no ARPs while at MCTC. Dovey Decl. ECF No. 7-2 ¶ 2. A review of the Warden's inmate correspondence log indicates Blankumsee has sent no correspondence related to COVID-19 matters to the Warden. *Id*.

### Preliminary Injunctive Relief

Emergency injunctive relief is an extraordinary remedy, awarded only after "a clear showing that the plaintiff is entitled to relief." *Dewhurst v. Cnty. Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008)) (internal quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "The standard for a temporary restraining order is the same as a preliminary injunction." *Antietam Battlefield KOA*, 2020 __ F.Supp. 3d__ , 2020 WL 2556496 *4 (quoting *Maages Auditorium v. Prince George's Cty., Md.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014), *aff'd*, 681 F. App'x 256 (4th Cir. 2017)). Blankumsee,

as the moving party, must satisfy each of these four requirements. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013).

Notably, Blankumsee addresses none of the requirements he must satisfy for preliminary injunctive relief. The Eighth Amendment to the Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). An official is liable under the Eighth Amendment if he acts with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To satisfy the deliberate indifference standard, a plaintiff must demonstrate first, that the alleged deprivation is, objectively, sufficiently serious, and second, that subjectively, the prison official acted with a sufficiently culpable state of mind. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

An official violates the Eighth Amendment rights by exposing an inmate to conditions that pose "a substantial risk of serious harm" to their health. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks and ellipses omitted).

The Eighth Amendment "protects against future harm," including a "condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Constitutional violations could arise from "the exposure of inmates to a serious, communicable disease" even if "the complaining inmate shows no serious current symptoms" and "even though the possible infection might not affect all those exposed." *Id.* "This includes confinement conditions that are

'very likely to cause serious illness and needless suffering' by 'exposure of inmates to [the] serious, communicable disease' of COVID-19." *Seth v. McDonough*, Civil Action No. PX-20-1028; 2020 WL2571168 *10 (D. Md. May 21, 2020) (examining conditions in the context of pre-trial detainees).

COVID-19 is a highly contagious disease that is potentially fatal, especially for individuals in high risk categories. Executive Order 20-04-15-01, ECF No. 7-3; Executive Order 20-04-18-01. ECF No. 7-1 at 10-14; Mitchell Decl. ECF No. 7-4. ¶¶ 5–11. There is no dispute that the Governor and prison officials were and are aware of the risk that COVID-19 poses; the issue is whether COVID-19 poses a substantial risk that is being disregarded by Defendant. *Id.*

The subjective component of an Eighth Amendment claim requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 307 (4th Cir. 2004). An official who knows of a substantial risk to inmate health of safety may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk known to the defendant at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000); *see also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014).

In light of the comprehensive measures implemented to prevent introduction and spread of infection from the COVID-19 virus at MCTC, with limitations reflecting those present in society as a whole, Blankumsee fails to meet his burden to show that Governor Hogan or MCTC staff has failed to act reasonably, or that Governor Hogan or a correctional staff member engaged

in conduct designed to harm him or create an unacceptable risk to his health. On this record, I cannot conclude that Defendant or prison officials disregarded a substantial risk of serious injury to Blankumsee based on the existing and ongoing response to the COVID-19 virus at MCTC.

Staff at MCTC has executed an extensive response to mitigate the threat of the disease. Mitigation is all that can be demanded since no science exists to cure or entirely prevent COVID-19. *See* Mitchell Decl. ECF No. 7-4 ¶ 10.[2] Scientists all over the world are working to eliminate the risk of the disease, but have so far been unable to do so and this Court can expect no more of Defendant or prison officials. This alters the balance of the analysis and lessens the weight that Blankumsee's risk of irreparable harm, the second requisite would otherwise carry.

Regarding the balance of equities, the State of Maryland maintains a strong interest in promulgating policies for prison management and security. *See O'Dell v. Netherland*, 112 F.3d 773, 776 (1997); *Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir. 1994) ("[A]bsent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities."). The State has an interest in ensuring that convicted inmates serve their sentences. Against this background and as noted, inmates who meet certain criteria are in the process of being vetted for release due to the threat of the virus. Of course, an

---

[2] Dr. Mitchell states:

> There is currently no vaccine, cure, or proven effective treatment for COVID-19. The only proven way to address the risk of infection is to avoid it by taking measures designed to reduce the chances of contracting the virus in the first place. And because there is no way to tell whether a person has the virus other than through testing—which is in short supply and, in any event, typically takes one to three days for a result—the Department is recommending preventive measures as part of one's everyday routine: (a) social distancing; (b) facial coverings when in public; (c) hand hygiene; (d) cough and sneeze hygiene; and (e) frequent cleaning and disinfection of "high-touch" surfaces.

ECF No. 7-2 ¶ 10.

outbreak of the virus or demonstrated insufficiency of the response at MCTC could alter this calculus.

The last requirement is whether a preliminary injunction would favor the public interest. Public health is a matter of public concern and limiting the spread of COVID-19 is a matter of public interest. The MCTC response satisfies the public interest by limiting the spread of the disease.  Blankumsee alleges no facts to show his release would serve the public interest.

Having concluded that Blankumsee has not met his burden to satisfy all four elements for award of preliminary injunctive relief, I will deny Blankumsee's request for immediate release. Blankumsee will be granted twenty-eight days to show cause why his claims should not be dismissed for to exhaust administrative remedies.  Failure to comply with these instructions will result in dismissal of his claims.

## Conclusion

For the reasons set forth above, Blankumsee's request for injunctive relief is denied. Blankumsee will be granted twenty-eight days to show cause why this action should not be dismissed for lack of exhaustion of administrative remedies.

**ORDER**

For reasons stated in the foregoing Memorandum Opinion, it is this 4th day of June, 2020, by the United States District Court for the District of Maryland, hereby ordered:

1. Plaintiff's request for Preliminary Injunctive Relief IS DENIED;

2. Plaintiff SHALL SHOW CAUSE within twenty-eight days why the Complaint should not be dismissed for lack of exhaustion of administrative remedies;

3. Plaintiff IS CAUTIONED that failure to comply with this Order will result in dismissal of this case; and

4. The Clerk SHALL MAIL a copy of this Order and the foregoing Memorandum Opinion to Plaintiff.

        /S/
Paul W. Grimm
United States District Judge